All right, our next case this morning is case number 5-25-0249, People v. Charles. I'm Fitzpatrick. Arguing for the appellant is attorney, is it Landor? Yes. And arguing for the appellee is attorney Jones. Are you ready to proceed? Yes. All right, you may proceed. Thank you. Please, for reporting purposes, state your name at the beginning of your argument. My name is Cecilia Landor, L-A-N-D-O-R. Good morning, Your Honors. May it please the Court, my name is Cecilia Landor and I represent Charles Fitzpatrick. First, the evidence in this case was extremely weak. Neither trial witness saw Mr. Fitzpatrick with a gun, their identification of him was questionable, and no forensic evidence supported his conviction. Despite this, his appellate counsel did not raise a sufficiency challenge. Secondly, Mr. Fitzpatrick's petition included a notarized affidavit from an individual who saw a person other than Mr. Fitzpatrick running away from the scene with a gun. At the second stage, this should be taken as true, and this case should be advanced to the third stage for an evidentiary hearing for the weighing of the credibility of these allegations. Just to get right into the case law, the most important evidence in this case was the eyewitness identification. So looking at the Biggers factors in the case law shows us just how weak that evidence was, and therefore how Mr. Fitzpatrick has made a substantial showing of his counsel's ineffectiveness. The most important factor in the Biggers factors is the opportunity of the witness to view the defendant at the time of the crime, and relatedly, their degree of attention at the time. Both of the witnesses in this case, Graham and Anderson, had different opportunities, but both of them had insufficient opportunities to view the defendant or the individual they identified as the defendant. So the sufficiency of the opportunity to observe is for the trier of fact to determine, and this is part of the issue. Without his appellate counsel raising this, Mr. Fitzpatrick wasn't able to draw attention to the weak evidence in this case. So Graham, Mr. Graham, the victim, had the best opportunity to view Mr. Fitzpatrick. He was two feet away from him in the car. It was a bright, sunny day. And Mr. Fitzpatrick was leaning into his car directly at his passenger side window. Graham clearly had an adequate opportunity to view Mr. Fitzpatrick. He was just two to three feet away from him, and he still did not see him shoot a gun, have a gun at any point, or make any movements that suggested that Mr. Fitzpatrick had a gun. Despite the closeness, the proximity between them, and the high degree of attention he was seeking directly to this man, they were having a direct conversation, and Graham testified at trial that he was directly looking at Mr. Fitzpatrick. Anderson's opportunity to view Mr. Fitzpatrick was much more compromised than Graham's even. She saw a big group of men, around 15 people. She was walking towards her house when she saw them, and she was looking back over her shoulder. She was also distracted. She was worried about getting her son into the house away from this developing melee. And she was approximately 75 feet, she testified, away from Fitzpatrick when he looked at her. She also wasn't making prolonged eye contact with him. She said she was worried about getting her son into the house, and she only heard gunshots afterwards. The other factors that go towards eyewitness identification are the length of time between the crime and confrontation, here only four days, and the witness's level of certainty, which also cut against the identification. Both of the witnesses were not certain that they had chosen the correct individual. Mr. Graham told officers he was only 70% to 80% sure that the photo he had selected was of the individual who interacted with him that day. And as the state mentions, he later told officers that he was 100% certain that it was Graham, but he did not think the officers would believe him if he expressed that certainty, which is simply difficult to believe, you know, anyone, any victim of a crime that had that level of certainty would want to communicate it at that time to the officers. Anderson herself was even less sure than that. She chose someone initially different than Mr. Fitzpatrick in the photo lineup, and she told officers she was only 60% certain she had chosen the correct individual. So neither of these witnesses were remotely close to 100% certain, and Ms. Anderson had actually picked a different individual than Mr. Fitzpatrick. Witnesses also gave different descriptions of the defendant, which is the fifth factor. They both gave differing descriptions, different in age, different in build, difference in facial hair. Anderson described a man with no facial hair, whereas Graham described a man with facial hair, but he did not mention that to the responding officer at the time of the incident. The only other evidence that Mr. Fitzpatrick was involved in this incident is that his electronic monitoring bracelet showed that he was in the area at the time, and he sent some text afterwards that the state argues shows culpability. But electronic monitoring evidence certainly shows that he was there with a group of 15 people, and he had actually asked his parole officer for permission ahead of time to leave the house. The texts he sent afterwards show merely that he was with this group and concerned about his status being on electronic monitoring and what that might show, but it doesn't show in any way that he might have done it. So given this extremely weak evidence in the case, appellate counsel should have exploited these various insufficiencies in the eyewitness identification, the only evidence that was in this case. No forensic evidence connected Mr. Fitzpatrick to the gun. No one actually saw him shoot a gun or hold a gun at any time. What if actually it was a situation by way of the evidence that essentially all of the windows were up in the vehicle, the driver's side window was cracked a bit, but the passenger side window was fully open, and that was where the defendant was standing. Is that accurate? Yes, yes, that's correct. And then the evidence was that there were two other individuals near the vehicle? Yes, that's correct. One being towards the front and one being towards the rear. Is that accurate? I think that it's, yes, there were two other individuals kind of like right standing next to him by the passenger window, and then the rest of the group was set back a little bit from the car. What was the evidence in terms of the other person being near the passenger side window? I mean, was it the evidence that the defendant was standing right in front of the passenger side window? Yes, yes, that was the evidence. And where was the other individual that you said was near the passenger side window? Yes, so Ms. Anderson testified to that, and she testified specifically that there were two people, there was this group of three people around the passenger side window. I don't think she testified specifically about like front or back, but I think just kind of crowded around the passenger side window, and yes, you're correct, I think the window was partially open, maybe fully open. And actually, in the crime scene photos, you can see that there are bullet casings all around the car, behind the car too, so there weren't just casings in the actual car. Anything else that struck the vehicle? Any other indications the vehicle was struck by any type of weapon, firearm or weapon? Nothing that indicated that it was struck by any object. You know, it looked like his winger had hit one of these people, potentially Mr. Fitzpatrick, so there was damage to the passenger side winger. So based on the evidence that was before the jury, is that not fairly strong evidence that what was fired came from the person standing next to the passenger side window? Otherwise, how else would the casings have been in the vehicle? So I would argue, you know, a couple things in response to that. First, that there were three people around the passenger side window, not just Mr. Fitzpatrick. And second of all, you know, given Mr. Graham's proximity, they were staring directly at each other and were speaking to each other, and it was a sunny day, it was like 6.30 p.m. It just, you know, it seems very difficult to believe that Mr. Fitzpatrick could have pulled out a gun and shot Mr. Graham without Mr. Graham having seen any of that. And so that's why I think, you know, to us, I think it's very plausible, and the evidence shows this, that Mr. Fitzpatrick was, while speaking to Mr. Graham, did not pull out a gun in one of his friends who were standing right by there. I think it's very likely that they did. But it's, I think, you know, ultimately the evidence doesn't show that Mr. Fitzpatrick did have a gun, and I think the fact that Ms. Anderson did not see that, and even more strongly the fact that Mr. Graham did not see that, or any sort of movement that he might have been about to pull out a gun, there's no evidence that shows that he, and especially the fact that he had that high degree of attention at the time. You know, someone has just hit him, or he's bumped into someone's car. Just seeing my time, I'd like to move on briefly to my second argument, if that's okay. Thank you, Your Honor. What are you going to move on to? Oh, my second argument about the affidavit. Okay, please. Yeah, I'd like to hear about that. So relatedly, Mr. Fitzpatrick's petition made a substantial showing of actual innocence through the affidavit that he provided. So given that his conviction rested on this flawed, questionable eyewitness identification testimony that was just discussed, you know, no one saw him with a gun or shoot a gun at any time, testimony from someone other than Mr. Fitzpatrick who saw, excuse me, testimony from someone who saw an individual other than Mr. Fitzpatrick running away would be highly material and probative. And the jury should have been presented with that evidence. And if they were, they might not have come to the conclusion that they did. You know, the State mentions that Hawking's affidavit is not valid. It actually is, given the fact that it was notarized. And he said, you know, as part of the notarizing process, you swear to the facts in the affidavit. The fact that he said he didn't say he would testify to those facts is not material, as the Fifth Amendment right against self-incrimination is not implicated here, as there is no co-defendant situation. You know, he has made a sufficient showing for the second stage of his actual innocence and should be allowed to move forward to an evidentiary hearing where he can fully develop these claims. Thank you, Your Honor. Other questions, Justice Packard? Not at this time, thank you. Justice Ballone, are we saying at the end that notary is the same as an affidavit? Oh, well, just that the State had argued that his affidavit wasn't valid, being that he hadn't specifically said therein that he would testify to those facts. But the case that they cited to specifically involved co-defendants, where one co-defendant would have to say, I will actually testify to this, due to giving up his Fifth Amendment right. Usually, though, an affidavit is underpinned as a per trip. See, that language you hear in this document? It's just notarized, and really all a notary does is say, this person showed me ID that he is Harry Hawkins. It doesn't mean that he's swearing the information there is true to us. Well, my understanding is that as part of the notarizing process, the notary asks if you would swear to the facts therein. And I think under that, the fact that he said that. Do you have a case that says that? I couldn't look. I don't have it right off hand. All right. Thank you. Thank you. We'll be giving time for a vote as well. Thank you. Ms. Jones? Okay. Please, the Court. My name is Kara Jones. I'm here on behalf of the State. I want to first address the whole argument about the fact that these three people were crowded around the passenger seat, which is not the evidence. The evidence from Anderson was that one was located near the front of the vehicle, and the other one was located near the rear of the vehicle. The one at the front was looking north, which was toward the front of the vehicle. The one at the rear of the vehicle was looking south. So you have the defendant in the middle, standing in the window, and we all know how large a car window would be, and he was described as having a stocky build. And then you have another person over here, way over here, looking this way. And you have the other person way over here looking that way, not even looking at Graham. So in order for one of those people to shoot Mr. Graham and hit him directly on the right-hand side through the open window, which was the only point of entry for this bullet, because there were no other windows down, there were no damage to other windows, there was no damage to any of the parts of the vehicle, they would have had to look in this way, lean way over, move their wrist this way, and fire the gun. I mean, it's not reasonable that anyone other than the defendant, who was standing in the window, shot this gun. Was there any evidence then by the other witness, Anderson, that saw either those two individuals with guns or making any type of movements, pointing a gun in the direction of the driver? No, Your Honor, her testimony was, and she was in a car when this all started, talking to her fiance. She got out of the car, she heard a noise, she saw these people crowding around this vehicle that had stopped. So as she's walking to her door, she's turning around and watching what's going on. Her son is on the porch. She didn't have an opportunity to view, and she had an adequate, I mean, the first act of opportunity and witness degree of attention was clear. She was watching the scene unfold. And she testified that she saw the defendant, he was standing in the window. Now, of course, she was on the opposite side of the street, so the car was beating her and the defendant. She saw the defendant with his hand on top of the vehicle, and he was leaning into the window. And then he raised up and scared her for 30 seconds to a minute. And she told her son, get in the house. And then she saw him lean back into the window. She then followed her son into the house, and as soon as she shut the door, heard the gunshots. So she didn't see a gun. Nobody saw a gun. But that doesn't preclude a finding of, I mean, there's plenty of circumstantial evidence here to support a finding, the jury's decision. Now, the defense would like to draw conclusions and inferences on the basis of innocence, which is not the standard. If an appellate court, appellate attorney was looking at this to determine whether to raise the sufficiency of the evidence claim, the standard is to view the evidence in the light most favorable to the state in favor of guilt. How do you explain that the victim never saw the gun in the defendant's hand? He was in a stressful situation is the best I can say. He's staring at this guy in the face. This guy has just threatened him and says, you know, you just hit me, and you're going to pay. He says, you effed up. You're going to pay me. And, you know, I think there's some testimony from Graham that he was just kind of, he also was looking at his phone at the same time he was staring at him because he was going to call 911, and then all of a sudden the shot's fired at him. But the circumstantial evidence of the defendant's presence there and the fact that he fired the gun was he's the only one in the window. It's the only point of entry. There are bullet casings in the car and around the passenger side of the car. Graham's injuries are to the right side, which is the side directly across from that passenger window. And then you have the eyewitness testimony saying that he was the one in the window. He's the only one in the window. Then you have the other circumstantial evidence. You have the evidence that his eyeball monitor shows that he wasn't home. The cell phone data from his phone shows he's in the area. Of course, the cell phone data can't pinpoint exactly where he was, but he was there. The text messages. Before the shooting, people texted him. He didn't respond. But after the shooting, he texts somebody saying, you know, well, I can't run from this. I'm going to have to go back to my old ways. And then he missed it. Well, he lived six or seven blocks from where the shooting happened. I mean, there are no cars in his area. Why is he searching for police scanners if he didn't know that someone had been shot six or seven blocks away, that he had shot somebody, and that he was wanting to see whether he was going to be picked up? And then he missed two appointments, one of which was supposed to happen the next day with his parole officer. So he was not just the eyewitness testimony. It's not just the bullets. It's not just the point of entry, the injuries. It's the whole picture. And the jury was the one who was to determine the credibility of the witnesses. All of the arguments that have been made on appeal about the reliability of these expert witnesses was thoroughly developed and thoroughly discussed at trial by trial counsel. And the jury, who was to determine credibility, determined that both of these eyewitnesses were reliable and believed their testimony that it was in fact authentic. I want to turn my attention to the actual innocence claim. This Conviction Hearing Act requires the defendant to file a petition that provides, it shall have attached thereto affidavits, records, or other evidence supporting its allegations, or shall state why the same are not attached. The Supreme Court has said that the evidentiary affidavit attached to a post-conviction petition serves two purposes. First, it must contain a factual basis sufficient to show the petition's allegations are capable of objective or independent corroboration. And second, it must identify with reasonable certainty the source's character and availability of the alleged evidence supporting the petition's allegations. In this case, we have a notarized statement. It's a statement, not an affidavit. The Supreme Court has specifically found that statements in a writing should not be sworn to before an authorized person cannot be considered affidavits. And that a statement that does not show that the person who made it was under oath is not an affidavit. There's no statement by either the, Mr. Hawkins, who wrote out, apparently wrote out this statement, that he swore to the things that were set forth in it. Nor did the notary public. And usually when you have a notary, it says, subscribe as sworn to before me on X day, notary signature. This statement doesn't have that. It's not an affidavit. It cannot be used to support a claim of actual innocence. I think it's the Notary Act. Is that required that the notary swear in the individual that signs? I believe that's true. I mean, without that statement, all the notary does is confirm that that is, in fact, the person that presented an ID and signed this document. I mean, it doesn't say that they swore to it before them. Furthermore, nowhere in Hawkins' statement does he state that he would testify to the facts alleged in the statement. And once again, the Supreme Court has said that the affidavit must establish the availability of the evidence. Well, we don't know if Hawkins is, I mean, he didn't swear that this was an accurate description, so he wouldn't be subject to perjury if he went, oh, I didn't write that. I didn't say that. I didn't swear to it. But also, we don't know whether he is even willing to come into court and testify to these things. Attorney Jones, I know the time goes quickly in these things. Other than the nature of whether this is an affidavit or not, could you take a moment to address the other factors, newly discovered evidence? Yes, Your Honor. First is the newly discovered evidence. Now, in their brief, they say that the affidavit from Harry Hawkins stating he witnessed the shooting was unavailable at the time, as Harry Hawkins was unknown to Fitzpatrick as a witness. And they cite to the record, reported proceedings, page 787, which is the defense counsel's oral argument. In their reply brief, they argue, well, there's also pages 290 and 291 of the common law record in support of that assertion. That's a cite to the memorandum of law signed by and filed by the defendant's attorney in support of the motion, amended petition. So the Supreme Court has said that the court will not rely on factual assertions made in a party's own argument that are not otherwise established in the record. And another Supreme Court case, which I cite, states, we obviously cannot rely upon a factual representation made in the background section of a party's own motion, which cannot be independently established in the record. And it's the defendant who bears the burden of showing that it's newly discovered evidence. So there's nothing related with regards to this statement that supports the fact that this is newly discovered evidence. There's nothing in there that says whether he knows the defendant and or how long they've known each other, how the defendant located Hawkins or when they first made himself known to the defendant, whether he even came forward prior to trial or after trial. I mean, there's nothing in this statement that shows that this document is newly discovered. I can address the other elements if you'd like me to, Your Honor. The other elements being materiality. Right. Briefly, if you would. Looks like your time's up. Yeah. Well, with regards to the conclusiveness, it has to be evidence that would have established or would have led to a belief that the result would be different. I would just point out briefly and quickly that Hawkins' statement doesn't identify who any of the people. It basically says, appears that he identifies two different people doing two different things, maybe three. One got hit by the car, went over to the group. Then he's identified, and he just identifies them as one of the guys. And then the second person is somebody he identifies as one who apparently crossed the street and everyone on the sidewalk parted like the Red Sea so he could walk through this melee and went up the street. And then he says there's a third person, but it's not quite clear whether this person is the same person who was hit by the car or a completely different third person who was seen running away with a gun. At no point in the statement does he identify either any of these individuals as being the defendant or not being the defendant. I mean, we don't know who these people are, and he doesn't even make a definitive statement that the defendant was any one of these individuals. It could have been. I mean, in fact, if you look at the evidence, his statement that he was hit by a car, that someone was hit by a car and then went to the side of the vehicle, actually would support the fact that it's defendant who shot the gun because that's consistent with the testimony of Graham, who the person who approached his window said, you hit me with the car, and then all the other evidence I already discussed. All right, thank you. Questions for Ms. Fullerton? Thank you. Thank you. I just want to make a few points. The first point I'd like to make is no one ever saw Mr. Fitzpatrick with a gun. If someone had seen him with a gun, it may not be as conclusive as the affidavit was here, but the fact is that no one saw him with a gun at any point, and he was given a 65-year sentence. No one is arguing that he wasn't there or that he wasn't a part of this group. Obviously, the electronic monitoring places him there. But, you know, the state points out these texts. These texts don't show anything except that he was part of this group. Again, no one has placed a gun in his hand at any point. No forensic evidence connects him to the gun. He was, as testified to by both of the witnesses, part of a group of 15 and part of a smaller group of three up by the window. Additionally, at this stage, Mr. Fitzpatrick only has to make a substantial showing of these constitutional violations. And, you know, in regards to the affidavit, it needs to be taken as true at this stage. And at an evidentiary hearing, any question about whether it was available can be dealt with then. I—let's see. I think that's all I got. Thank you. Any questions for Justice Hoppe? No, thank you. Justice Palmer? Briefly, so to me it's fairly critical what the evidence showed in terms of the relation of these two other individuals near the vehicle. Now, I asked you the question, and then the opposing counsel addressed that. And opposing counsel's argument differed from yours in terms of their locations. Opposing counsel had them standing on the rear and in front of the vehicle, facing away from the vehicle. Now, what is the evidence? Is that contrary to the evidence, or was there any evidence to show otherwise at this trial? I think, you know, I think that the fact that they were— they may have been standing at other sides of the vehicle doesn't negate the fact that there's no evidence that Mr. Fitzpatrick himself was the shooter. Like I mentioned before, there are bullet casings. If you look at the exhibits found on either sides of the car, you know, quite far away from the actual car itself. And so it's really unclear the fact that neither witness can testify to, you know, seeing someone with a gun. I think obviously there was a harm done and someone was hurt here. But I think the fact is it can't be shown that it was Mr. Fitzpatrick. I'm also sorry. I did briefly want to return to this issue of the affidavit. My understanding is that, you know, Mr. Hopkins had his affidavit notarized. He didn't just write this and send it off. He went to the trouble of having it notarized. And my understanding is that there is a process of swearing that in to the notary. And the state, you know, in their response, they say that like the one case that they have is about this Fifth Amendment issue. And so I would just rest on that this is a valid affidavit at this time and should be taken as true. Based on that, Mr. Long, do you have any other questions? Just a second. No, thank you. Thank you. Thank you. We appreciate the briefs and your arguments. We will take the matter under advisement and make the decision in due course.